06-1038
*In re NYSE Specialists Securities Litigation*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: February 26, 2007                    Decided: September 18, 2007)

Docket No. 06-1038-cv
_____

In Re: NYSE SPECIALISTS SECURITIES LITIGATION
_____

CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,
and EMPIRE PROGRAMS, INC.,

*Lead Plaintiffs-Appellants*,

v.

NEW YORK STOCK EXCHANGE, INC.,

*Defendant-Appellee.*[*]
_____

Before:      JACOBS, *Chief Judge*, LEVAL and SOTOMAYOR, *Circuit Judges*.
_____

Lead plaintiffs-appellants ("Lead Plaintiffs") appeal from a judgment of the United States

District Court for the Southern District of New York (Sweet, J.), granting defendant-appellee the

New York Stock Exchange, Inc.'s (the "NYSE" or the "Exchange") motion to dismiss the

complaint, which alleged various violations of the Securities Exchange Act of 1934 (the

"Exchange Act"), stemming from claims that the NYSE failed to regulate and provide a fair and

---

[*] The Clerk of Court is directed to amend the official caption in conformance with the one
listed above.

-1-

orderly market and from a claim under Rule 10b-5, 17 C.F.R. § 240.10b-5, that the NYSE made

misrepresentations about the integrity of its market, upon which Lead Plaintiffs relied in trading

on the NYSE.   We agree with the district court that Lead Plaintiffs' claims concerning the

Exchange's alleged regulatory failures were barred by the doctrine of absolute immunity, but we

vacate the district court's ruling that Lead Plaintiffs lacked standing to bring suit under the

Exchange Act or Rule 10b-5 for the NYSE's purported misrepresentations concerning the

NYSE's market integrity and internal operations and remand for proceedings consistent with this

opinion.

       AFFIRMED in part, VACATED in part and REMANDED.

> ERIC ALAN ISAACSON (William S. Lerach, Mark Solomon, Byron S. Georgiou, William J. Doyle II, Tami Falkenstein Hennick, Lucas F. Olts, *on the brief*), Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; and Christopher Lovell, Imtiaz A. Siddiqui, *on the brief*, Lovell Stewart Halebian LLP, New York, NY, *for Lead Plaintiffs-Appellants.*
>
> DEBRA M. TORRES, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, NY, *for Defendant-Appellee.*

SOTOMAYOR, *Circuit Judge*:

       Lead plaintiffs-appellants California Public Employees' Retirement System ("CalPERS")

and Empire Programs, Inc. ("Empire") (collectively "Lead Plaintiffs") appeal from a judgment of

the United States District Court for the Southern District of New York (Sweet, J.), *In re NYSE*

*Specialists Secs. Litig.*, 405 F. Supp. 2d 281 (S.D.N.Y. 2005) ("*In re NYSE Specialists*"),

granting defendant-appellee New York Stock Exchange, Inc.'s (the "NYSE" or the "Exchange")

motion to dismiss Lead Plaintiffs' claims that the NYSE failed to regulate and provide a fair and orderly market and their claim under Rule 10b-5, 17 C.F.R. § 240.10b-5, that the NYSE made misrepresentations about the integrity of its market, upon which Lead Plaintiffs relied in trading on the NYSE.  Lead Plaintiffs argue that the district court erred in finding that the NYSE is entitled to absolute immunity because, having abandoned its regulatory role to maintain a fair and orderly market, the NYSE was not acting consistently with the quasi-governmental powers delegated to it when it permitted and encouraged misconduct and fraud on its trading floor.  Lead Plaintiffs further contend that the district court erred by finding that they lacked standing under Rule 10b-5 to bring suit against the Exchange for purported misrepresentations about its integrity and internal operations, upon which Lead Plaintiffs relied in trading on the NYSE.  For the reasons to be discussed, we affirm the judgment of the district court as to the NYSE's absolute immunity for its alleged regulatory failures, but vacate the district court's ruling that Lead Plaintiffs lacked standing under Rule 10b-5 and remand for further proceedings consistent with this opinion.

## BACKGROUND

Because this appeal challenges the grant of a motion to dismiss, we must take the facts alleged in the complaint as true, drawing all reasonable inferences in Lead Plaintiffs' favor.  *See Port Washington Teachers Ass'n v. Bd. of Educ. of Port Washington Union Free Sch. Dist.*, 478 F.3d 494, 498 (2d Cir. 2007).  Taken in this light, the facts are as follows.

The NYSE is registered with the Securities and Exchange Commission ("SEC") as a national securities exchange pursuant to section 6 of the Exchange Act, 15 U.S.C. § 78f.   As a registered exchange, the NYSE is deemed by the Exchange Act a self-regulatory organization

("SRO"), *see* 15 U.S.C. § 78c(a)(26), which means that the Exchange "has a duty to promulgate and enforce rules governing the conduct of its members." *Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 51 (2d Cir. 1996). We have previously noted that the SEC has delegated to the NYSE "substantial authority . . . to regulate [its] own conduct and that of [its] members." *MFS Secs. Corp. v. N.Y. Stock Exch.*, 277 F.3d 613, 615 (2d Cir. 2002).

 *The NYSE and the Specialist Firms*

 According to the complaint, the NYSE was at all times relevant to the action (the "Class Period") a nonprofit corporation, charged with overseeing the world's largest stock exchange, which lists over 2,800 publicly traded companies.[1] The NYSE is organized under the principle that investors in the companies traded on its floor, whether individual or institutional, are entitled to equal opportunities to interact and receive the best prices available on their trades. Because the Exchange itself does not execute the actual trading in these 2,800 companies, it facilitates this auction market by funneling trades through seven Specialist Firms (the "Specialist Firms" or the "Firms"), which are charged with managing "the stocks assigned to them to create a fair, competitive, orderly and efficient market." Consolidated Compl. ¶ 37.

 Each security listed for trading on the NYSE is assigned to a particular Firm. To execute purchases and sales of a particular security, buyers and sellers must present their bids to buy and offers to sell to the specific Specialist Firm assigned to that security. The primary method of trading on the Exchange occurs through the NYSE's Super Designated Order Turnaround System, which transmits orders to buy and sell to the Specialist Firm electronically. The orders

---

[1] The Exchange is no longer a nonprofit corporation, following a merger which commenced after the filing of this lawsuit. The NYSE now operates under the name NYSE LLC as a for-profit entity. NYSE LLC is registered with the SEC under the Exchange Act as an SRO.

appear on a special electronic workstation often referred to as the "display book." Each Specialist Firm has a computerized "display book" at its trading post that permits the Firm to execute orders for the market.

By acting as either the agent for investors or principal for itself in the sale and purchase of the individual securities to which they are each assigned, the Firms are required to make and display continuous two-sided quotations that accurately reflect prevailing market conditions in order to maintain a liquid and continuous two-sided public auction. When acting as agent, the Specialist Firms match the orders of buyers and sellers, whose bids and offers appear on the display book, and thus ensure the timely execution of trades at the best available price. When acting as principal, the Specialist Firms

> [a]re permitted to execute, in certain limited circumstances, trades on a "principal" or "dealer" basis, when required to do so to maintain a fair and orderly market. In such circumstances, such as if there were no matching orders to sell and orders to buy, the specialist was permitted to execute an investor's order to buy stock by selling the stock from the specialist's proprietary account, or "inventory" of stock, to the investor. Additionally, the specialist was permitted to execute an investor's order to sell stock by buying that stock and holding the stock in the investor's inventory.

*In re NYSE Specialists*, 405 F. Supp. 2d at 290.

The substantial powers of, and the near-total control exercised by, the Specialist Firms over any given stock on the NYSE create an opportunity to manipulate the market for self-gain. The complaint alleges that "[t]he Specialist Firm is constantly in a position to trade for its own proprietary accounts while in possession of material non-public information regarding the supply and demand for a given stock, in part through its knowledge of existing but unexecuted" orders.

Consolidated Compl. ¶ 52.[2]  Cognizant of this risk, the Exchange has promulgated internal rules that govern the conduct of Specialist Firms, including rules that require the Firms to "adhere to the principles of good business practice," NYSE Rule 401(a), and rules that prohibit any Firm from trading on its own account unless it is reasonably necessary to maintain a fair and orderly market, *see, e.g.*, NYSE Rule 104(a) ("No [Specialist Firm] shall effect on the Exchange purchases or sales of any security in which such [Firm] is registered, for any account in which [it] . . . is directly or indirectly interested, unless such dealings are reasonably necessary to permit such [Firm] to maintain a fair and orderly market . . . .").  Thus, Lead Plaintiffs allege that the rules require the Firms to act as principal only in the limited situations where doing so is necessary to maintain a fair and orderly market.

Lead Plaintiffs allege that during the Class Period, the Specialist Firms actively took advantage of their unique position to self-deal and that the NYSE neglected or abandoned its regulatory duties and oversight of the Specialist Firms by permitting and in some cases encouraging blatant self-dealing.  Through "wide-ranging manipulative, self-dealing, deceptive and misleading conduct," the Firms and the Exchange allegedly violated several sections of the Exchange Act, SEC rules, and the NYSE's own rules and regulations.  In the complaint, Lead

_____

[2] For instance, taking an example from the complaint for illustrative purposes:  If a Specialist Firm knew that for one of the stocks assigned to it, 10,000 shares were bid at $89.06 and 10,000 shares were offered at $89.00, the Firm, following proper regulatory protocols, should allow the trade to go through at $89.03, giving both sides a fair and orderly execution in the public market.  According to Lead Plaintiffs' allegations, however, the Specialist Firm would often in such situations act as a principal and buy the 10,000 shares at $89.01 and then sell them at $89.05.  While both the original buyer and seller would receive a $.01 price improvement on their initial trade positions, the Firm, by acting not as agent but as principal, was able to use non-public bid and offer information to make a $.04 profit per share for itself in a matter of seconds. Consolidated Compl. ¶¶ 78-79.

Plaintiffs alleged five types of misconduct, the first four of which involve the NYSE either turning a blind eye to, or actively encouraging, the Firms' self-dealing:

- "Interpositioning," whereby a Specialist Firm prevented the normal agency trade between matching public orders and instead interposed itself between the matching orders in order to generate profits for itself.

- "Trading ahead," in which a Specialist Firm undertook trades for its own account before undertaking trades for public investors.  Because the Specialist Firm knew how the public investors' orders would impact the stock price, it used this confidential knowledge to its own commercial advantage.

- "Freezing the book," whereby a Specialist Firm froze its display book for a given stock in order to engage in trades for its own account first before undertaking any orders for public investors.

- Manipulating the "tick," whereby a Specialist Firm changed the price of the stock to affect principal trades.

The fifth type of misconduct alleged by Lead Plaintiffs involves the effort to conceal evidence of the Specialist Firms' malfeasance, in which the NYSE actively sought to help the Firms skirt or violate the securities laws by, *inter alia*, falsifying reports, tipping off Specialist Firms to impending investigations, and covertly encouraging misconduct.  This wide-ranging fraudulent scheme allegedly resulted in hundreds of millions of dollars in illicit profits for the Firms and the NYSE.

*The SEC Report and Enforcement Actions Against the NYSE and Specialist Firms*

According to the complaint, the "complete and utter failure of the NYSE to regulate the Specialist Firms' conduct during the Class Period" is detailed in a November 3, 2003 *Wall Street Journal* article describing the contents of a confidential SEC report prepared as part of an official SEC investigation of the NYSE and the Firms, begun in early 2003.  Consolidated Compl. ¶ 230. The article summarized the report's conclusions about the Exchange's regulatory failures,

including that the NYSE had failed "to police its elite floor-trading firms" and "ignor[ed] blatant violations" of prohibitions on self-dealing; that the Exchange was "an in-house regulator either ill-equipped or too worried about increasing its workload to care"; and that the NYSE had "no meaningful surveillance, allowing inappropriate behavior to continue" and causing "significant" customer harm totaling in the hundreds of millions of dollars. The SEC report has never been publicly released.

This newspaper article was followed several months later by announcements on March 30, 2004 and July 26, 2004 from the SEC that it had come to settlement agreements with each of the Specialist Firms, in which the Firms acknowledged that they had failed to maintain a fair and orderly market for their assigned securities as required by law. The Specialist Firms consented to the announced settlement, without admitting or denying the findings, that they had violated the Exchange Act through fraud and manipulation. The Firms further agreed to pay to the SEC settlements totaling nearly 250 million dollars for their transgressions.

On April 12, 2005, the SEC announced the simultaneous filing and settlement of "an enforcement action against the New York Stock Exchange, Inc.," which indicated that the "NYSE consented, without admitting or denying the findings, to entry of an order imposing a censure and requiring the NYSE to cease and desist from future violations of the federal securities laws." Press Release, Sec. & Exch. Comm'n, SEC Charges the New York Stock Exchange with Failing to Police Specialists (Apr. 12, 2005), *available at* http://www.sec.gov/ news/press/2005-53.htm. The announcement further noted:

> [s]pecifically, the Commission's Order finds that from 1999 through 2003, various NYSE specialists repeatedly engaged in unlawful proprietary trading, resulting in more than $158 million of customer harm. The improper trading took

-8-

various forms, including "interpositioning" the [F]irms' dealer accounts between customer orders and "trading ahead" for their dealer accounts in front of executable agency orders on the same side of the market. From 1999 through almost all of 2002, the NYSE failed to adequately monitor and police specialist trading activity, allowing the vast majority of this unlawful conduct to continue. The illegal trading went largely undetected because the NYSE's regulatory program was deficient in surveilling, investigating and disciplining the specialists' trading violations.

*Id.* The Exchange, as a result of this settlement, agreed to implement new oversight methods and to fund their implementation to the sum of $20 million.

*The Alleged Misrepresentations*

Throughout the Class Period, the NYSE repeatedly made public statements about the operations of its Specialist Firms and its oversight of their daily functions. For instance, in a press release dated January 8, 2001, the Exchange allegedly stated: "Our agency-auction model joins the greatest liquidity and transparency with the most efficient method of price discovery, leading to the lowest execution costs and best prices for customers." The NYSE ran advertisements featuring Warren Buffet of Berkshire Hathaway, who touted the savings in transaction costs for his company achieved through listing on the Exchange, and who further observed that "[w]e wanted the best market that we could obtain for our shareholders. The NYSE is that market." Moreover, high-level employees of the Exchange, including its then-Chairman Richard Grasso, issued public statements that assured the public of the NYSE's integrity and its longstanding commitment to an open and fair market. Lead Plaintiffs claim that these statements deliberately created "the false impression that [the Exchange] was overseeing and operating its auction market in accordance with laws, rules and regulations, and l[ed] investors to believe that the NYSE was an honest and fair market," and that they relied on these

-9-

misstatements in trading stocks listed on the NYSE's exchange during the Class Period.

*The Instant Suit*

On October 17, 2003, a class action suit was filed in the United States District Court for the Southern District of New York against the Specialist Firms and the NYSE. Several related class actions were also subsequently filed in the same court. On May 27, 2004, the district court entered an order consolidating the related cases, choosing CalPERS and Empire as Lead Plaintiffs, and appointing lead counsel. Lead Plaintiffs filed an amended consolidated complaint, and the defendants, including NYSE, moved to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. In a published opinion, the district court denied the motions as to the individual defendant Specialist Firms, but granted the NYSE's Rule 12(b)(6) motion on the basis that as an SRO, it enjoyed absolute immunity on Lead Plaintiffs' claims that the Exchange had abandoned its regulatory duties and that the Lead Plaintiffs lacked standing under Rule 10b-5, 17 C.F.R. § 240.10b-5, to pursue their misrepresentation claim against the Exchange. *In re NYSE Specialists*, 405 F. Supp. 2d at 302-306. On February 9, 2006, the district court granted the Lead Plaintiffs' motion for certification and entry of final judgment with respect to the NYSE pursuant to Federal Rule of Civil Procedure 54(b). This timely appeal followed.

## DISCUSSION

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Nicholas v. Goord*, 430 F.3d 652, 657 (2d Cir. 2005). A court should not dismiss a case on such a motion "unless . . . satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). Towards this end, we must accept all allegations in the complaint as

true and draw all inferences in the light most favorable to the non-moving party's favor, *Port Washington Teachers' Ass'n*, 478 F.3d at 498, but we need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness," *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 27 (2d Cir. 1989) (internal quotation marks omitted).

We first consider whether the NYSE is entitled to absolute immunity from claims stemming from either the Exchange's active or passive complicity in the Specialist Firms' misconduct, and then turn to address whether Lead Plaintiffs have standing to bring their Rule 10b-5 claim for the Exchange's alleged misrepresentations concerning its regulatory activities and the integrity of its market.

I.     Absolute Immunity

Absolute immunity affords "complete protection from suit," *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982), because it gives "public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities," *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987), so that they will not feel "constrained in making every decision by the consequences in terms of [their] own potential liability in a suit for damages," *Imbler v. Pachtman*, 424 U.S. 409, 424-25 (1976). The doctrine's nature "is such that it 'accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action,'" *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (quoting *Robison v. Via*, 821 F.2d, 913, 918 (2d Cir. 1987)), even where the challenged conduct was motivated by a wrongful motive or even malice, *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985)). Given this significant protection, we have

cautioned that the doctrine "is of a rare and exceptional character." *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986) (internal quotation marks omitted).   As such, courts must examine the invocation of absolute immunity on a case-by-case basis, *DL Capital Group v. NASDAQ Stock Mkt. Inc.*, 409 F.3d 93, 97 (2d Cir. 2005), and the party asserting immunity bears the burden of demonstrating its entitlement to it, *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104 (2d Cir. 2001).

Although the NYSE is not a government entity, we have recognized that in certain circumstances, it is entitled to absolute immunity for actions it takes pursuant to its quasi-governmental role in the regulation of the securities market. *See Barbara*, 99 F.3d at 58 ("Although the Exchange is a private, rather than a governmental entity, immunity doctrines protect private actors when they perform important governmental functions."). Indeed, as in other absolute immunity contexts, we focus on "the nature of the function performed, not the identity of the actor who performed it," *Forrester v. White*, 484 U.S. 219, 229 (1988), in order to determine whether an SRO, such as the Exchange, is entitled to immunity, *see D'Alessio*, 258 F.3d at 104-06 (applying functional approach to determine whether the NYSE was entitled to immunity). Applying this analysis, we have found stock exchange SROs absolutely immune from suit where the alleged misconduct concerned (1) disciplinary proceedings against exchange members, *Barbara*, 99 F.3d at 59; (2) the enforcement of security rules and regulations and general regulatory oversight over exchange members, *D'Alessio*, 258 F.3d at 106; (3) the interpretation of the securities laws and regulations as applied to the exchange or its members, *id.*; (4) the referral of exchange members to the SEC and other government agencies for civil enforcement or criminal prosecution under the securities laws, *id.*; and (5) the public

announcement of regulatory decisions, *DL Capital Group*, 409 F.3d at 98.  The common thread

in these cases is that absolute immunity attaches where the activity "relate[s] to the proper

functioning of the regulatory system."  *D'Alessio*, 258 F.3d at 106 (internal quotation marks

omitted).  Indeed, because

> [t]he NYSE, as a[n] SRO, stands in the shoes of the SEC in interpreting the
> securities laws for its members and in monitoring compliance with those laws . . .
> [i]t follows that the NYSE should be entitled to the same immunity enjoyed by the
> SEC when it is performing functions delegated to it under the SEC's broad
> oversight authority.

*Id.* at 105.  Thus, so long as the "alleged misconduct falls within the scope of the

quasi-governmental powers delegated to the NYSE," absolute immunity attaches.  *Id.* at 106.

Lead Plaintiffs argue that under our precedents, the doctrine of absolute immunity applies

solely when SROs act (1) affirmatively and (2) consistently with the powers delegated to NYSE

in its quasi-governmental role.  Because the allegations demonstrate that the NYSE failed to

regulate and at times actually participated in fraud and misconduct, Lead Plaintiffs further

contend, the doctrine does not bar their claims.  We disagree.

Lead Plaintiffs first argue that our prior decisions in this area have protected only the

affirmative assertion of regulatory power by an SRO and that immunity does not exist where the

NYSE does not act and has essentially, in their words, "abandoned" its duty to regulate.  In

*D'Alessio*, however, we expressly found the NYSE absolutely immune where plaintiff

complained of NYSE's "*fail[ure]* to monitor D'Alessio's and other floor [members']

compliance" with securities law and regulations because such conduct "plainly falls within the

scope of the quasi-governmental duties delegated to the NYSE."  258 F.3d at 106 (emphasis

added).  While this discussion in *D'Alessio* was cursory, as the case focused on other allegations

of the NYSE's misconduct, we are not persuaded that absolute immunity should protect an SRO that decides to act but not one that decides not to act. The power to exercise regulatory authority necessarily includes the power to take no affirmative action. After all, the purpose of immunity is to give governmental officials – or those acting with the express delegation of the government, as with SROs – breathing room to exercise their powers without fear that their discretionary decisions may engender endless litigation. *Barbara*, 99 F.3d at 59 (stating that "allowing suits against the Exchange arising out of the Exchange's [quasi-governmental] functions would clearly 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" in enacting the Exchange Act) (second alteration in original). It makes little logical sense to cabin that needed breathing room by according immunity only to the decision to act. While absolute immunity by its very nature necessarily gives rise to a risk that reprehensible conduct – whether active or passive – will go unpunished, that risk is accepted so that SROs will not be excessively timid in their regulatory decisions, including in their decisions not to act. Thus, we conclude that extending absolute immunity only to affirmative acts is neither warranted by our caselaw nor consonant with the purposes of absolute immunity.

Our understanding of immunity is further buttressed by this Circuit's prior decisions in other absolute immunity contexts where, for instance, a prosecutor, protected by absolute immunity in the decision to prosecute an individual, was similarly found immune for the decision not to prosecute. *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) ("[A]s a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on his decision *not* to prosecute."); *see also Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006) ("[W]e can divine no meaningful difference between the Attorney General's decision in this case not to

-14-

defend a state employee and the decisions of prosecutors and government attorneys to initiate (or

not to initiate) civil or administrative proceedings."); *accord Harrington v. Almy*, 977 F.2d 37, 40

(1st Cir. 1992) (holding that immunity applies to "this action – or more accurately [this] refusal

to act").  Accordingly, to the extent that this concept was unclear in our prior precedent, we make

the assertion plain:  If an SRO's exercise of a governmental power delegated to it deserves

absolute immunity, the SRO's nonexercise of that power also entitles it to immunity.

     In their second argument, Lead Plaintiffs, relying on *D'Alessio*, 258 F.3d at 106, assert

that an SRO receives absolute immunity only "when acting in its capacity as a[n] SRO" and only

to the extent that it "engages in conduct consistent with" its regulatory powers (i.e., no absolute

immunity when an SRO acts inconsistently with the regulatory goals of the SEC).  This position

certainly has superficial appeal, but when scrutinized, its flaws become evident.  First, we cannot

square our holdings in *D'Alessio*, *Barbara*, or *DL Capital*, with Lead Plaintiffs' assertion here.

In all three cases, the alleged misconduct of the SRO stock exchanges involved acts or

determinations that could easily be characterized as inconsistent with the powers or functions

delegated to them or beyond their capacities as SROs because the organizations had violated the

very rules they were supposed to enforce.  *See D'Alessio*, 258 F.3d at 98 (plaintiff alleged that

the NYSE provided government investigators with "false, misleading and inaccurate

information" about him and that the NYSE had failed to disclose to the SEC that it had

"approved and encouraged" the practice for which plaintiff was charged) (internal quotation

marks omitted); *Barbara*, 99 F.3d at 52 (plaintiff claimed that the NYSE wrongfully barred him

from the exchange floor, causing him to leave the securities business); *DL Capital*, 409 F.3d at

96 (plaintiff alleged that the NASDAQ had committed fraud by "failing to disclose" its decision

to cancel trading on a particular stock in a timely manner).  It is clear that the claim in each case was that the defendant SRO abused its regulatory power.  Analyzing these entities under our functional approach, however, we determined in each case that the SROs were entitled to absolute immunity because they were acting within the scope of the powers granted to them.  Lead Plaintiffs attempt to distinguish these cases as involving only the positive use of governmental power, but, as discussed above, this is simply not the holding of *D'Alessio* or the other immunity cases like *Schloss* in which this Court has repeatedly held that the nonexercise of a governmental power is entitled to the same immunity as an exercise of that power.  There is accordingly no way to give coherence to our caselaw without rejecting this part of Lead Plaintiffs' argument.

Second and more importantly, the central question our SRO-immunity cases ask is not whether the SRO is acting (or not acting) "consistent with" the laws it is supposed to apply but rather whether the plaintiff's allegations concern the exercise of powers within the bounds of the government functions delegated to it.  Under our precedent, the immunity protects the power to regulate, not the mandate to perform regulatory functions in a certain manner.  Thus, the immunity depends only on *whether* specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions.  Indeed, if "consistent with" and "capacity" meant that immunity only attaches to those who follow the law, the immunity doctrine would be effectively subverted.  After all, individuals characteristically do not bring suit alleging an SRO is obeying its statutory and legal obligations; they bring suit alleging an SRO is violating the law or acting inconsistently with its legal obligations.  Lead Plaintiffs here are accordingly asking us to carve out an exception that would all but swallow the doctrine

-16-

whole, and this we decline to do.[3]

In sum, the proper way to read *D'Alessio*'s use of the terms "consistent with" and "capacity" is to focus on the specific function at issue in the allegations of misconduct to determine whether the conduct is "consistent with" the exercise of power delegated to the SRO and for which this Court has accorded absolute immunity.  If such conduct was within the ambit of the SRO's delegated power, immunity presumptively attaches, even where the SRO wrongly exercises that power.

A.    Application

Given this understanding of our caselaw, it is clear that the misconduct alleged by Lead Plaintiffs readily falls within the ambit of the quasi-governmental functions the SEC has delegated to the NYSE.  Indeed, of the five categories of misconduct that Lead Plaintiffs allege in their complaint (interpositioning, trading ahead, freezing the book, manipulating the tick, and

---

[3] We also observe that Lead Plaintiffs' complaint is rife with language suggesting that absolute immunity is inappropriate where an SRO has either recklessly permitted or knowingly fostered wrongdoing and fraud.  *See, e.g.*, Consolidated Compl. ¶¶ 188-91 (noting the Exchange's "proven track record of failing to adequately monitor and maintain surveillance and enforce compliance of its member firms' operations" because "the NYSE as well as its top executives had a direct financial interest in the successful continuation of that scheme").  This would, however, undermine the immunity doctrine we apply today because it threatens to import a "bad faith" or "bad motive" element to absolute immunity, which is incompatible with the doctrine's purpose.  *Shmueli*, 424 F.3d at 237 (absolute immunity "is such that it accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action") (internal quotation marks omitted); *Bernard*, 356 F.3d at 503 (absolute immunity applies even where the challenged conduct was motivated by a wrongful motive as such intent is irrelevant).  Indeed, as the Ninth Circuit has cogently observed, "[t]he results of any immunity rule may be harsh," but Congress nevertheless saw fit to delegate to SROs certain regulatory powers for which they "enjoy freedom from civil liability when they act[] in their regulatory capacity," even where the SROs "act[] in a capricious, even tartuffian manner which cause[s] . . . enormous damage."  *Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 159 F.3d 1209, 1215 (9th Cir. 1998).

concealing evidence of wrongdoing), the first four involve what Lead Plaintiffs themselves characterize as the failure or abandonment of the Exchange's regulatory duties. For example, Lead Plaintiffs complain that the NYSE – either with intent, knowledge or reckless disregard – permitted the Specialist Firms (1) to engage in interpositioning in violation of the Exchange's own regulations and (2) to trade ahead and front-run stocks to their tremendous financial advantage in violation of the securities laws and regulations. Lead Plaintiffs also claim that the NYSE turned a blind eye to the manipulation of the tick price of the stock and that the practice of freezing the book was a point of contention between the SEC and the Exchange in terms of the length of time that a Specialist Firm could engage in such activity. It is clear that these claims all involve the NYSE's action or inaction with respect to trading on the Exchange, which is indisputably within the NYSE's regulatory powers. Moreover, Lead Plaintiffs' own characterizations of the above claims implicitly concede that the NYSE was acting within the realm of the oversight powers delegated to it by the SEC. *See, e.g.*, Consolidated Compl. ¶ 5 (alleging NYSE's "deliberate failure to properly oversee, regulate or supervise its securities exchange" and that the "NYSE deliberately failed to halt, expose or discipline the illegal trading practices [of member firms] to the extent necessary to deter, stop or prevent them"). This is a tacit concession that the NYSE's decisions to act (or not to act) with respect to the Specialist Firms' conduct is "consistent with" the powers delegated to it by the SEC.[4] Because these claims

---

[4] Moreover, throughout the complaint, Lead Plaintiffs allege that NYSE violated its own internal rules in permitting, for instance, trading ahead, *see* Consolidated Compl. ¶ 87 (noting that NYSE Rules 105 and 476 prohibit this type of conduct), or acting as principal when it was not necessary for the maintenance of a fair and orderly market, *id.* ¶¶ 71-74. They appear then to admit that the action (or inaction) complained of involves the NYSE's regulatory powers, and our own review of the NYSE's internal rules leads to the inexorable conclusion that the Exchange's enforcement (or nonenforcement) of these rules clearly implicates the quasi-

all relate to the "proper functioning of the regulatory system," *D'Alessio*, 258 F.3d at 106 (internal quotation marks omitted), the district court did not err when it granted immunity to the NYSE for its action or inaction with respect to these claims.

We confront a somewhat thornier question in evaluating the allegations that the NYSE knowingly permitted, or even actively encouraged, the Specialist Firms to submit doctored or altered regulatory reports to the NYSE and that it alerted the Specialist Firms to impending internal NYSE investigations so that the Firms could conceal evidence of wrongdoing. Lead Plaintiffs' allegations here focus on the NYSE's approach to weekly Form 81 Reports ("Form 81"), which every Specialist Firm was required to submit when it engaged in principal trades. The NYSE floor officials, Lead Plaintiffs claim, permitted their names and badge numbers to be used in preparing false Form 81s, essentially vouching for trades that they knew to be improper or wrong and even when the NYSE discovered a possible falsification, it would send the relevant Form 81 back to the Firm and permit the Form 81 to be resubmitted with the "correct" information. Officials at the Exchange also allegedly "tipped off" at least one of the Specialist Firms about an imminent investigation before the official announcement, permitting it, now forewarned, to alter its records to conceal its misconduct. At first glance, none of these actions appears to fall within the ambit of the powers delegated to the Exchange. The gravamen of the Lead Plaintiffs' claims, however, centers on the functions performed by NYSE in its supervisory

---

governmental functions the SEC has delegated to the NYSE. *See, e.g.*, NYSE Rule 104(a) (prohibiting a Specialist Firm from trading for its own account unless reasonably necessary to maintain a fair and orderly market); NYSE Rule 92(a) (prohibiting any member or member organization of the NYSE to trade on its proprietary account if it has knowledge of "any particular unexecuted customer's order to buy (sell) such security which could be executed at the same price"); NYSE Rule 401(a) (requiring members and member organizations to "adhere to the principles of good business practice in the conduct of his or its business affairs").

and regulatory role: announcing investigations, signing off on regulatory reports on the stock exchange floor, and examining the Form 81s for content and legality.  While these actions may not appear to form the heart of the regulatory functions delegated to the NYSE as an SRO, they are nonetheless central to effectuating the NYSE's regulatory decisionmaking.  Indeed, in *DL Capital Group*, this Court noted that without the capacity to perform certain acts related to its core regulatory functions, an SRO "would be stripped of . . . critical and necessary part[s] of [its] regulatory powers."  409 F.3d at 98 (internal quotations omitted).  Examining and approving Form 81s and other regulatory paperwork are critical and necessary to the NYSE's fulfillment of its regulatory role and oversight duties and the district court correctly granted immunity to the Exchange on this point.  Similarly, the timing and method of the announcement of an official investigation is entitled to absolute immunity.  Because "investigative actions taken by agency officials prior to the issuance of the formal order [announcing an official investigation] are within the scope of [the SEC agents'] duties," *Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983), the NYSE, "stand[ing] in the shoes of the SEC . . . in monitoring compliance" with the securities laws, enjoys the same immunity as the SEC when "performing functions delegated to it under the SEC's broad oversight authority," *D'Alessio*, 258 F.3d at 105.  It is thus clear that these allegations concern regulatory functions for which the NYSE is entitled to absolute immunity.

  B.  The Fraud Exception

  Lead Plaintiffs also argue that the wide-ranging misconduct and fraud allegedly permitted or undertaken here by the NYSE should qualify as an exception to the absolute immunity bar. They cite our decision in *DL Capital Group* where we stated that

   precedent, not to mention common sense, strongly militates against carving out a

"fraud" exception to SRO immunity. As to precedent, this Court has already implicitly held that SROs are absolutely immune to suits alleging fraud. In *D'Alessio*, after all, we upheld the dismissal of all the plaintiffs' claims even though one of the claims was for "fraudulent deceit and concealment." . . . Not only that, but this Court has, in other contexts, made clear that allegations of bad faith, malice, and even fraud–all of which may be relevant to a *qualified* immunity analysis–cannot, except in the most unusual of circumstances, overcome *absolute* immunity.

409 F.3d at 98 (citations and footnote omitted). Lead Plaintiffs contend that this case presents the "most unusual of circumstances," thus entitling them to overcome whatever grant of absolute immunity this Court might otherwise accord. While we agree that the abuse of trust fraud purportedly engaged in by the Specialist Firms and the Exchange over the years-long Class Period appears egregious, we still conclude that a fraud exception should not apply here – even a one-time, "most unusual circumstances" exception. Indeed, courts have applied the absolute immunity doctrine without carving out a fraud exception even in cases alleging fraud in situations that directly implicate constitutionally protected personal liberty interests in the criminal context, including a case where a prosecutor allegedly committed fraud upon the courts in a criminal prosecution for capital murder, *Imbler*, 424 U.S. at 416 (alleged prosecutorial misconduct included knowingly permitting false testimony at trial and submitting altered evidence to the jury), or where allegedly unconstitutional restrictions were placed on a grand juror attempting to investigate official misconduct, *Fields v. Soloff*, 920 F.2d 1114, 1119 (2d Cir. 1990). If a fraud exception is not warranted in those situations where an individual's very liberty may be at stake, we conclude such an exception is also not appropriate here. Moreover, while Lead Plaintiffs characterize this case as representing the "most unusual of circumstances," an exception here may open a Pandora's box that would undermine the entire purpose behind the

immunity doctrine. *See DL Capital Group*, 409 F.3d at 99 ("Thus, rejecting a fraud exception is a matter not simply of logic but of intense practicality since [otherwise] the [SRO's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits.") (internal quotation marks omitted).

Lastly, we have cautioned before that courts confronted with claims of absolute immunity should consider "whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct" if absolute immunity applies. *Barrett*, 798 F.2d at 571 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 521-23 (1985)). The alternatives here are manifold. The SEC, after all, retains formidable oversight power to supervise, investigate, and discipline the NYSE for any possible wrongdoing or regulatory missteps. *See, e.g.*, *DL Capital Group*, 409 F.3d at 95 ("[I]f an SRO has violated, or is unable to comply with, *inter alia*, the provisions of the Exchange Act, its own rules, or the rules of the SEC, the SEC is authorized to suspend or even revoke an SRO's registration, as well as to impose lesser sanctions.") (citing 15 U.S.C. § 78s(g)). As the facts here pellucidly illustrate, the SEC did intervene and investigate the Exchange and the Specialist Firms and extracted from them considerable settlements, which not only garnered widespread public attention but included significant monetary penalties and implemented new methods of market regulation and oversight.

For all of the reasons stated above, we conclude the NYSE is entitled to absolute immunity and affirm the district court's determination on this issue.

## II.    Lead Plaintiffs' Standing to Sue for the NYSE's Alleged Misrepresentations

The district court concluded that Lead Plaintiffs lacked statutory standing to pursue their misrepresentation claims against the NYSE. However, the district court's reasons for dismissing

the Lead Plaintiffs' claims were flawed.  Citing our opinion in *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), the district court ruled that no liability can exist under Rule 10b-5 for "statements by a non-issuer [of the security that is the subject of the suit] about a non-issuer."  *In re NYSE Specialists*, 405 F. Supp. 2d at 305.  We recognize that *Nortel Networks* contains language that could be read to suggest that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased.  *See, e.g.*, 369 F.3d at 28 (suggesting that an individual lacks standing to sue a company "for making a material misstatement when the individual purchased the security of a company other than the one that made the misstatement"); *id.* at 34 ("Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase.").  Such a reading, however, would place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers.

That is not what *Nortel Networks* held.  In *Nortel Networks*, the plaintiffs had purchased stock in JDS Uniphase.  Plaintiffs claimed that a different company, Nortel Networks, knowingly made falsely optimistic public statements about its own financial prospects.  On the basis of a business relationship between JDS Uniphase and Nortel Networks, the plaintiffs claimed that their purchase price for JDS Uniphase stock had been inflated by Nortel Networks' false statements about itself.  In the particular circumstances of the case, the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5.

In short, the district court incorrectly read *Nortel Networks* to mean that an action under

Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable. Accordingly, we vacate the district court's decision with respect to statutory standing.

We express no opinion on the other grounds for dismissal that the NYSE raised below because we lack proper briefing on those issues. On remand, however, the district court is free to entertain such arguments. Specifically, we point the parties' and the district court's attention to the arguments regarding whether the NYSE enjoys SRO immunity for its alleged misrepresentations. *See, e.g.*, *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 468 F.3d 1306 (11th Cir. 2006), *reh'g en banc granted*, 481 F.3d 1295 (11th Cir. 2007). *But see DL Capital Group*, 409 F.3d 93; *Weissman*, 468 F.3d at 1313 (Tjoflat, J., dissenting). Likewise, the district court may consider whether Lead Plaintiffs have pled that reliance on the alleged misrepresentations caused their loss. Without a clear understanding as to what Lead Plaintiffs' theory of reliance is – whether they are asserting direct reliance on the alleged misrepresentations or are asking the Court to presume reliance based on a doctrine such as the fraud-on-the-market theory – we think it is inappropriate at this time for us to decide whether those pleadings are adequate to state a claim. We note, however, that Lead Plaintiffs' Rule 10b-5 claims do not appear to be of the nature where the fraud-on-the-market theory would apply, where the misrepresentation itself affects the market price of the security purchased. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in part, vacate the judgment in part and remand for proceedings consistent with this opinion.